ELIZABETH JAQUES, Appellant, v. THE SIOUX CITY TRACTION Co.

**Street railways:** PERSONAL INJURIES: NEGLIGENCE. In an action for injuries received in attempting to board a street car, the evidence is considered, and it is held that the issues of negligence in operating the car and of contributory negligence on the part of plaintiff, should have been submitted to the jury.

**Fraud:** RETURN OF CONSIDERATION . On a plea that a release from liability for an injury was procured by fraud, an offer to return the consideration need not be made.

**Fraud:** EVIDENCE. Evidence considered and held that the issue of fraud in procuring a release from liability for personal injury should have gone to the jury.

VOL. 124 IA.—17

*Appeal from Woodbury District Court.*— HON. A. D. BAILIE, Judge.

WEDNESDAY, JUNE 8, 1904.

ACTION for damages. Verdict was directed for defendant, and from judgment entered thereon the plaintiff appeals.—*Reversed.*

*George W. Argo* and *L. L. Cathcart,* for appellant.

*J. S. Lawrence,* for appellee.

LADD, J.— The street car line branches from Pearl street, extending north and south, to West Seventh street, shortly before reaching the bridges in each over Perry creek.

1. PERSONAL INJURY: negligence. The first intersecting street below is Seventh. There is an alley between, a short distance south of which is the switch on the east track. In passing, from Pearl street the car is switched over on the west track, and, after moving north a short distance, again to the West Seventh street track. At about eight o'clock in the evening of August 27, 1901, one of defendant's cars, in going up Pearl street, slowed up in order to switch to West Seventh street, but missed and stopped. The motorman then backed the car up, but, as he was doing so, the plaintiff, who was attempting to board it, was thrown to the ground and injured. She had been delivering laundry at the Mondamin and Garretson Hotels, and was returning to her home on Fourteenth street, about two blocks from West Seventh, with a large bundle of clothes and many small ones, which she had gathered to wash. Both arms were full. To the strap around the large bundle she had attached two pairs of shoes, and, as the street car overtook her near the alley, she signaled the motorman by shaking these shoes, and immediately approached the car.

She testified that: " He looked right in my face, and stopped the car close by me. The car was standing still when I tried to get on. I put my left foot on the step.

The car moved backwards after I got my foot on the step. Q. Well, was it backed up slowly or quickly? A. The car went back fast enough to throw me down. * * * I was standing still when I put my foot on the step. They did not give me any notice that they were going to back. The conductor came to open the door and let me in. He saw me before I fell. * * * I had seen the switch and had stopped the car there before. I knew the up car and down car met at the switch. I had gotten on there often before." Cross-examination: "I started to run, and kept on running right to the car, and the car stopped right there. I thought the car stopped just as soon as I made the motion. I thought they stopped for me. * * * The conductor was in the door. I saw him look at me when I made the motion. * * * When I went out to the car from the sidewalk I just put my foot right up, because my arms were so full of bundles. Then I fell." The conductor testified that " men get off and on there, but it is not the regular stopping place "; that cars do not stop between streets for passengers; that cars only stop at the place in question to make the switch; that he was collecting fares when someone remarked, " There is a lady," and he immediately pulled the bell to stop, and the car did so within four feet. The motorman explained that he saw no one; that after he had missed the switch he looked in the glass in front, and, as no one was getting off, he backed the car in order to throw the switch, when the conductor warned him to stop, which he did within a distance of two feet, and that the first he knew any one was hurt was when the conductor informed him a lady was attempting to get on the car when he started back. The testimony of three passengers tended to show that the car was moving when plaintiff attempted to get on, while that of another was that " she stepped on the step, the car threw her over against the car, then started up the other way and threw her again."

Enough of the evidence has been set out to indicate that

upon the issues of negligence the case ought to have gone to
the jury.   There is no dispute but that plaintiff undertook
to board the car at a place where the defendant had fre-
quently received passengers.   It is immaterial whether this
was at a street intersection or not.   The law does not under-
take to point out where passengers shall be received on board
of a street car.   The company, in absence of any regulation
by city ordinance, had the perfect right to stop for them at
the middle of the block, as is customary in many localities
where the street intersections are at an unusual distance
apart, or at any other point it might choose.   And this may
be done so frequently at a particular place that the public
may well assume that it has been fixed upon by the company
as an appropriate locality to receive passengers.   One of the
duties of the motorman is to keep an outlook for those who
may desire to ride, and, when this is manifested, to afford
them a reasonable opportunity to get on in safety.   3 Thomp-
son, Negligence 3511.   The character of the signals given
to him differ almost as much as the persons giving them.
All-essential is that in some way he be made to understand
what is desired.   The evidence was such that the jury might
have found that passengers were customarily taken on the
car at the switch.   As, according to plaintiff's testimony,
the motorman was looking at her when she shook the shoes
and approached the car, he might have been found to have
understood that she was about to board the car.   See *Barry
v. Burlington R. & L. Co.,* 119 Iowa, 62.   It may be that
if the car was moving back at the time the signal was given,
and no stop was made until after her attempt to get on, the
company ought not to be held guilty of negligence.   This
point need not be determined, for in that event plaintiff
could not succeed, owing to her own negligence.   But if,
while undertaking to mount the car when standing, she was
thrown from her balance and caused to fall by a sudden
backing of it, and the motorman in doing this knew, or in
the exercise of reasonable care ought to have known, that

she was getting on, the defendant may well have been found guilty of negligence. 3 Thompson, Negligence, sections 3513, 3514. See *Root v. Ry. Co.,* 113 Iowa, 675.

Appellee insists, however, that the appellant was guilty of contributory negligence. If it appeared, as counsel assumes, that she attempted to get upon the car while in motion, this may have been true. She was over 50 years of age, had both arms full of packages, and could not steady herself by seizing the handhold with either hand. One with such a load could not safely rely on being able to balance herself on the steps of a moving car. *Reddington v. Philadelphia Traction Co.,* 132 Pa. 154 (19 Atl. Rep. 28) *Baltimore T. Co. v. State,* 78 Md. 409 (28 Atl. Rep. 397); 3 Thompson, Negligence, section 3567. But the plaintiff's testimony was to the effect that the car had stopped, and, if so, there seems no doubt but that she might have gotten on, even though her arms were full, with safety. Women do this daily in carrying babies, bandboxes, and birdcages, and what is so commonly accomplished without injury or thought of danger ought not to be held, as a matter of law, to be negligent. Whether plaintiff by any fault on her part contributed to her own injury was for the jury to determine.

II.   The defendant pleaded the following writing as releasing it from farther liability:

" We hereby release the Sioux City Traction Company from any claim for personal injuries or damage whatsoever due to injuries received by Mrs. Paul Jaques the 27th day of July, 1901, on the West Seventh street line of said company, said Sioux City Traction Company being entirely blameless; the consideration for the above release being $5.00, receipt of which is hereby acknowledged.

" Dated at Sioux City, Iowa, July 31, 1901.

her

" Name, Mrs. Paul X Jaques.

mark.

" Paul Jaques.

" Witness: A. C. Frickland."

The plaintiff in her reply alleged that this was procured by fraud, but did not offer to return the amount received. This was not necessary. *O'Brien v. C., M. & St. P. R. Co.*, 89 Iowa, 656.

**2. FRAUD:** return of consideration.

Neither the plaintiff nor her husband could read or write English, and, if they are to be believed, defendant's claim agent called on plaintiff a day or two after the accident in the guise of a Good Samaritan and gave her $5 to help her along for a week, represented that the paper signed was a receipt only, and, upon the suggestion of the witness to her signature that it be read, declared this unnecessary. They swore that the matter of settlement was not mentioned, and that they never knew that the paper was other than a receipt. All this was denied by the agent, who testified that the money was paid in pursuance of a settlement agreed to and that the release was read over to them before being signed. He is somewhat corroborated by Frickland. But the jury might have accepted that version of the affair related by the plaintiff and her husband, and, if so, must have concluded that the release was obtained by deceit practiced on them.

**3. FRAUD:** evidence.

Some other questions are discussed, but as they will not be likely to arise on another trial, it is unnecessary to decide them.— REVERSED.