JOHN A. JEEZ, Appellant, v. A. Y. McDONALD MANUFACTUR-
ING Co., Appellee.

**MASTER AND SERVANT:** Negligence of Master—Contributory Negligence—Jury Questions. Evidence reviewed, and held to present a jury question as to the master's negligence in directing a servant to place in a melting pot articles which were liable to explode, or in so placing them that they would naturally be placed in said pot; likewise, a jury question as to plaintiff's contributory negligence in placing said articles in the pot.

**MASTER AND SERVANT:** Master's Liability—Negligence of Foreman. A master who has assigned to his foreman the duty of sorting different material for melting, is responsible for the act of the foreman in directing the servant to melt materials known by the foreman to be liable to explode.

**RELEASE:** Avoidance—Fraud—Master and Servant. A written release of a valuable right or subsisting cause of action may be repudiated on the ground of fraud and misrepresentation. Evidence reviewed, and held to present a jury question on such avoidance.

**RELEASE:** Avoidance—Return of Consideration Received—When Not Necessary. A release may be avoided for fraud and misrepresentation without returning the consideration received for the release when it appears that the consideration was given to the injured party for known and acknowledged injuries and for nothing else.

**RELEASE:** Avoidance—Fraud—Evidence. On the question whether a release of a valuable right was secured by fraud, all conversations between the parties, both before and after the release was executed, relating to a settlement, should be received.

**PLEADING:** Form and Allegation—Pleading Evidence—Motion to Strike. A pleading of pure evidence is properly stricken on motion.

*Appeal from Dubuque District Court.*—ROBERT BONSON,
Judge.

MONDAY, JANUARY 22, 1917.

ACTION at law to recover damages for personal injuries
received by plaintiff, while in defendant's employment as
a helper to a head melter, in a brass foundry conducted by
the company in connection with its manufacturing plant
in the city of Dubuque.

The negligence charged is that of the foreman, William Maine, who, it is claimed, carelessly furnished for
melting, two brass balls, which were filled with water or
other liquid, so that, when subjected to heat, they were
likely to, and did, explode, causing the injuries of which
plaintiff complains. The defendant denied all negligence,
pleaded assumption of risk and contributory negligence,
and also a settlement, accord and satisfaction. Plaintiff
denied the settlement; pleaded that it was obtained from
him through misrepresentation, fraud and deceit. On these
issues, the case was brought on for trial to a jury, and, at
the conclusion of the testimony, the trial court, on motion, directed a verdict for defendant, and plaintiff appeals.—*Reversed.*

*Kenline & Roedell,* for appellant.

*Hurd, Lenehan & Kiesel,* for appellee.

DEEMER, J.—I. Defendant, as a part of
his manufacturing business, maintained a
brass foundry, which consisted of something
like twenty melting pots made of graphite,
each having its own furnace, and so constructed that they were operated independently of each
other. The pots were so constructed that the tops were
from 6 to 12 inches below the floor of the shop, and each
rested upon a bed of coals, and coal was also packed around
them. A heavy iron lid was placed over them, when melt-

1. MASTER AND
SERVANT: negligence of master: contributory negligence: jury questions.

ing was being done.  The furnaces proper were some distance beneath the floor, and they were fed from the top. Ashes were removed through an opening in the floor, and this opening was usually covered with an iron grating.  In front of. these, the brass to be melted was piled, and this usually consisted of scraps, which had to be sorted and placed in different piles before the furnaces.  Usually, some brass borings were put into the pots early in the day, with heavier metal on top, and fresh supplies of this heavier material were added, from time to time, as the material already in assumed a molten form.  The brass used came from different departments, as waste and cuttings from finishing and cutting machines, and foreign scrap or junk coming in from the outside.  All this was sorted into three grades, known as red, yellow, and steam metal.  There was also a difference in the method of treatment of local stuff— that is, matter coming from the factory proper—and that from the outside, in the form of junk received from peddlers and all outside sources.  Again, the factory material was also sorted with reference to its size and character. The outside material came in boxes, barrels, etc., and was in the form of plumbers' scrap metal, and all sorts and sizes of waste brass of every description.  This foreign metal was generally known as red, and all of it was sorted, the red· placed in one pile, the yellow in another, and the steam in another, and the various kinds were placed in front of the furnaces, or melting pots, in boxes or on the floor.  From these piles, it was shoveled or placed by hand in the pots.  At the time of the accident, which occurred on November 2d, 1912, the material to be used in the furnaces came from the outside.  It was mostly red, and was placed in a conical pile, about 2 feet high and 3 feet across. One Maine was the foundry foreman, and Stecher was the head melter; plaintiff and others were what are known as helpers.  When Maine was present, plaintiff and the other

helpers took their orders directly from him (Maine).
When he was not present, Stecher was in control. The
foreman did the sorting of the metal, and he performed
the duty on the day of the accident; and he also gave direc-
tions to all as to what to do. In sorting, Maine looked
over the material carefully, to guard against having any
iron go into the furnace, and also separated the different
kinds of brass according to their character. Plaintiff had
nothing to do with the sorting of brass, save as he might ·
infrequently be called upon to assist. His duties were to
look after the pots, to see that none of them became broken,
to keep up the fire, and to feed the pots from the piles of
brass which had been sorted and placed near the furnaces
for melting.

On the morning in question, a lot of scrap brass came
into the foundry in barrels, and Maine sorted about 1,000
pounds, early in the day. Most of this consisted of what is
known as red brass, and, when sorted, was placed near the
furnace which was being used for that kind of material.

According to some of the testimony, when plaintiff
went to work, on the morning of the accident, he was di-
rected to use the red scrap; and, going to the pile, he
found two balls on top thereof. Never having seen such
material before upon the red scrap pile, he showed them,
so he says, to Maine. Maine played with them a while,
rolled them upon the floor, and finally replaced them upon
the pile of scrap, and, according to plaintiff's testimony,
told him to put them in the melting pots. Plaintiff says
he asked the foreman if they were all right, and was as-.
sured by the foreman that they were. Plaintiff thereupon
took a new pot, put in some fine borings of brass, then the
two balls, covered all up in the usual manner, put the pot
on the furnace, and then returned to his usual work. Plain-
tiff says he had never before seen such balls, and that for
this reason he showed them to Maine. Maine himself tes-

tified that he realized the balls were dangerous; that he thought they might possibly be bombs; that he discussed the matter with the engineer; and claims that, instead of telling plaintiff to put them in the pot, he placed them on top of boxes containing yellow brass, which were behind the red pile upon which plaintiff was working.

Shortly after the balls were put in the pot, and it had become heated, there was an explosion. Stecher, the head melter, rushed over to the furnace, as did other men about the foundry, and there saw the foreman, Maine. There was considerable confusion among the men and someone remarked: "Look out, there is another one." Stecher noticed that the lid was blown off the pot and the crucible was considerably shattered; but, thinking there was no danger of a second explosion, he grabbed a pair of tongs, to pick out the pieces of metal for use in another pot. Stecher did not at this time know that two brass balls had been put in the pot, and the foreman, although present, said nothing about it. Stecher also said that he did not think there was any danger of a further explosion, because everything seemed to be blown to pieces. Plaintiff followed Stecher with another pair of tongs, to assist in the work. Maine, the foreman, was standing close at hand, but he made no remarks. Someone asked Stecher what caused the explosion, and he said he thought it was one of the brass balls. Plaintiff and Stecher together went to work trying to rescue the pot and the brass before it ran down onto the grates of the furnace, and Stecher got hold of one side of the pot with his tongs and plaintiff of the other, when a second explosion occurred. Plaintiff testified that he did not know whether there were two explosions in the first instance or but one; that he knew he had put the two balls in the pot, but did not know, when he went to the assistance of Stecher, that but one of them had exploded. We here quote some testimony from the record, regarding

what was done by the men, about the time of and just after the explosion. First, from the testimony of Maine on cross-examination:

"I heard a loud explosion like a cannon, when standing in front of the first boiler talking with Jecklin. I said to him, 'There goes one of them brass balls, I bet you;' and thought it was one of those balls that went off, because that was the first thing that came into my mind; had talked with Jecklin about the balls before that. I was the first man to look into the furnace; after the first explosion and before I got over there was about two seconds. The lid was off, the pot was shattered. Stecher and Jeez came a very few seconds after I got there, with tongs to remove the pieces of metal that were not melted. I stepped back to give them room, and they got one piece out when the other explosion occurred. The first thing after I got there was to ask Jeez if he put these balls in when he was standing at the furnace ready to take the pieces out, and he said he had. Then I said, 'Where is the other one?" and he said, 'It is in there;' and I then stepped back to give Stecher and Jeez room to pull up these pieces of metal with these tongs. Did not say anything to them at that time, and when they were in there with these tongs, I stepped a step and a half back when the other one went off. Before they had taken anything out, I learned there was another ball in there; before they went up there at this crucible and trying to get anything out, I asked Jeez, and after he told me that there was another ball in there—I hadn't turned around—I just took a step and a half back, looking at them all the time; and after I learned there was another ball in there, did not say a word to Stecher and Jeez. I didn't have time to think. There was a great deal of confusion and commotion there. I was excited. If I thought there was much danger, I wouldn't have looked in there myself."

Witness Young testified in substance as follows:

"When the first explosion occurred, Maine, in front of the boilers, said, 'There goes one of them darn balls,' and ran very quickly to get to where the furnace was; and he said to Jeez, 'Where is the other ball?' and Jeez replied, 'It is in the same pot.'

"Maine was the first man to look into the hole where this crucible was; and while he was poking into it, Jeez and Stecher came with their tongs, and Maine stepped back. When he asked Jeez where the other ball was, he said nothing further, but let them go to work at the pot; stepped back just merely a couple or three feet to give them room to get at it, just enough room so that Stecher and Jeez could come with the tongs and work at the pot. When Maine stepped back, Jeez and Stecher reached down into the pot and brought out an old valve and threw it aside, and reached down again, and bang she came (referring to the second explosion). At the time the second explosion took place, Stecher and Jeez were at the furnace picking up pieces of the melting pot and metal in order to clean it out and get ready for another run, and both were using tongs. Between the first explosion and the second explosion, there was but a very little space of time, not more than 3 to 5 minutes."

The second explosion threw molten metal into the faces of both Stecher and Jeez, causing severe and permanent injuries to plaintiff. No such explosions had ever before occurred in the foundry, although small sputterings would occur, when wet or cold metal was thrown into the pots with molten metal in them. The brass balls were 4 and 5 inches in diameter, with walls three eighths of an inch thick. They were hollow, and were plugged up with screws. Solid brass balls had theretofore been placed in the pots, and small balls with light walls had also been thrown in; but it also appears that all hollow balls were always there-

tofore opened up by boring, or crushed before being put in
the scrap pile for melting; and it was the foreman's duty
as we understand it, to see that this was done, during the
sorting, in order to avoid explosions. Even if the balls con-
tained nothing but air, it was necessary that it be released;
and again, it might be that they were filled with some ex-
plosive matter, which should be released before attempt
was made to melt them. Maine saw the balls, handled
them, was suspicious of them, showed them to the engineer,
and placed them, so he claims, upon the pile of yellow
brass, in order to call the superintendent's attention to
them, and ascertain what they were. He knew they were
not solid, and he attributed the explosion to the fact that
they each contained a little water. Others about the shop
saw the balls, and they said they were new to them. Some
little discussion was had between the men before the ex-
plosion, and plaintiff called the foreman's attention to
the matter before he put them into the furnace.

There is a sharp dispute in the testimony regarding
two main points in the case. First, regarding the statement
said to have been made by Maine, the foreman, when plain-
tiff called his attention to the balls; plaintiff testifying that
Maine told him, after examining the balls, that they were
all right, and to put them in the pot. This statement is de-
nied by Maine. Second, plaintiff testified that Maine, after
examining the balls, and making the statement just re-
ferred to, placed them upon the red pile, which was being
used the morning of the accident; while the foreman tes-
tified that he did not put them upon the red pile, but with
the yellow brass, on the top of one of the boxes near the
furnace, and behind the pile of red brass, which was being
melted that day.

It is agreed that it was the duty of the foreman to
sort the brass for melting purposes, and that he did not
entrust this to anyone else. He was in charge of all the

men in the foundry, and they were to obey his orders. Plaintiff had been a helper to the head melter, Stecher, for 2 or 3 months prior to the accident, although he had had some experience of the same kind before that. As helper, it was his duty to feed the melting pots, adding metal as it was needed, and to act as an assistant to the head melter ·in everything connected with the furnaces and melting pots. He got this metal from the piles left by the sorter, and used it as directed. He had nothing to do with the sorting of the metal, or as to what pots and furnaces should be used, save as he was given direction as to what to do. But if a pot burst, or was leaking, or anything happened to the furnace about which he was working, it was his duty to look after it.

Foreman Maine had never before seen balls like the ones which exploded, and he had never seen such an explosion before. This is the substance of the testimony, which, we may observe in passing, is generally given its most favorable light for plaintiff, as it should be in reviewing a motion to direct a verdict for the defendant. Was it sufficient to take the case to a jury on the question of negligence on the part of the defendant, and of contributory negligence on the part of the plaintiff?

We are constrained to hold that there was enough testimony to justify the jury in finding that the foreman, Maine, was negligent in two particulars: If it found that this foreman specifically directed plaintiff to put the two balls in the melting pot, knowing that they were plugged, this, in itself, might amount to negligence on the part of Maine. Again, if, without giving any such specific directions, Maine, after examining and handling the balls, placed them upon the pile of red brass which plaintiff was then engaged in melting, this, too, might be sufficient to justify a finding that Maine was not exercising the proper degree of care. So, too, we think that the question of plaintiff's

care, and of his assumption of risk, assuming both to be in the case, were properly for a jury.

Under the facts recited, it is apparent that these questions were really of fact for a jury, and not of law for the court. We shall not cite authorities for either proposition, as no case can be found exactly like it. Such questions depend so largely upon the conditions and circumstances of the parties, their knowledge of the danger incident to the work, the authority one has over the other, and the directions given the injured party, that they are generally submitted to a jury as triers of the fact, the law being very well settled with regard thereto.

On the main issues of the case, the only doubtful question is whether the defendant is responsible for the conduct of its foreman, Maine. Appellee makes no claim that defendant is not responsible for his conduct, and we are relieved of any extended investigation of the authorities.

2. MASTER AND SERVANT: master's liability; negligence of foreman.

Defendant, recognizing the dangers, and being particular as to the sorting of the different kinds of brass for melting purposes, entrusted this particular work to its foreman, Maine, and he, and he alone, did it. This work was not delegated to another, and defendant itself undertook, through its said foreman, to supply plaintiff and the head melter with the material to be melted. This foreman, having knowledge of the character of the brass balls and of the custom to open or mash them, did neither. He handed them to plaintiff, with directions to put them in the pots, or, according to some of the testimony, did what was the same thing, left them on the pile of red brass, which plaintiff was then engaged in melting. He, the foreman, either knew or should have known of the danger, yet, notwithstanding, he directed an employee, who was subject to his orders, to use them. In such circumstances, the employer is liable for the negligence of its foreman, because

he was in duty bound to exercise usual and ordinary care in supplying the other employees with proper material with which to work. Such seems to be the rule announced in Labatt on Master & Servant (1st Ed.), Vol. 1, Sec. 141, pp. 297 *et seq.; Gallman v. Union Hardwood Mfg. Co.,* (S. C.) 43 S., E. 524; *Louisville & N. R. Co. v. Semonis,* (Ky.) 51 S. W. 612; *Nickel v. Columbia Paper Stock Co.,* (Mo.) 68 S. W. 955; *Neveu v. Sears,* (Mass.) 29 N. E. 472; *Hardy v. Chicago, R. I. & P. R. Co.,* 149 Iowa 41; *Kimmerle v. Dubuque Altar Mfg. Co.,* 154 Iowa 42, 47; *O'Keefe v. National Folding Box & Paper Co.,* (Conn.) 33 Atl. 587; *Northern Pac. R. Co. v. Herbert,* 6 Sup. Ct. Rep. 590 (116 U. S. 642, 647). Perhaps a jury would have been justified in finding the foreman guilty of negligence after the first explosion in not warning the plaintiff of the danger of another explosion while he, plaintiff, was working at the pot with Stecher, trying to save defendant's property.

II. We are informed that the trial court directed the verdict on the theory that plaintiff was guilty of contributory negligence, as a matter of law; and that he had fully settled with the defendant for the injuries done him, and accepted and retained the compensation paid. We have already disposed of the question of plaintiff's contributory negligence, and the only remaining question in the case relates to the settlement pleaded in defense. It is admitted that plaintiff received from defendant, or from an accident company which insured defendant against such losses, the sum of $604 in money, which, it is claimed, represented $500 for the injury and $104 for wages lost, while in the hospital; and that defendant paid plaintiff's doctor and hospital bills, amounting to $236.15, making a sum total of $840.15; and no part of this sum has been repaid to defendant or the insurance company.

3. RELEASE: avoidance: fraud: master and servant.

The following written release was also introduced in evidence by defendant:

## "RELEASE.

"I (John Jeez), hereby admit and acknowledge that there has been paid to me in hand this day by the A. Y. McDonald Manufacturing Company the sum of (Eight Hundred and Forty 15-100) ($840) Dollars in full settlement, accord and satisfaction of any and all claims or demands of every description which I now have or may hereafter have against the said A. Y. McDonald Manufacturing Company on account of an accident causing injury to me on or about November 2, 1912.

"It is understood that all terms of settlement are included in this Release.

"In testimony whereof, I have hereunto set my hand and seal this (19th) day of (December) 1912.

(John Jeez.)       (Seal.)

(N. M. Harris)
(F. W. Coates)
  Witnesses.

"(Certain characters representing foreign writing as testified to.)       (John Jeez)."

The words in parentheses above are written in ink; the balance in typewriting.

The foreign writing referred to, as translated, reads as follows:

"I am known what is in this paper or by this paper and what it means, and I understand all what happened in it, and what is meant by it. I have gotten all my rights, and will not again opposite in anything against it all in my case against the McDonald factory company because I have been injured or delayed on November 2nd, 1912."

Plaintiff signed the papers at the place indicated, but he claims that he did not understand what was in them; that he could not read English or Arabic—the latter language being used in the supplementary note. Plaintiff was injured November 2, 1912. He was immediately taken to the Finley Hospital in Dubuque, where he remained until after Christmas. Some time in the latter part of November, he was visited by one Thorne, attorney for the defendant and the accident company, for the purpose of talking over a settlement of the case.

On December 19th, Thorne again visited plaintiff, at that time being accompanied by one Coates, a claim agent for the defendant, who was called upon as a witness. The release had then been prepared, save that it did not contain plaintiff's name, the amount to be paid, the dates, or the signatures. These parties went together to a room in the hospital, and there the matter was talked over by plaintiff and Thorne, for an hour or more, in the presence of Coates; and it is claimed that the amounts stated in the release were agreed upon and inserted therein, and finally signed by plaintiff after the whole matter was fully explained to him. It was witnessed by Coates, and by one of the hospital nurses. The part written in the foreign language (Arabic), was also on the paper when signed by Jeez, and he then appended his signature thereto. The money was counted out and given to plaintiff, and he accepted and kept the same. It does not appear how the Arabic writing on the release came to be there, but undoubtedly it was secured by Thorne; for it was on the release when Thorne presented it on the day it was signed. Thorne was dead when the case was called for trial, and his testimony was not taken.

While it appears that plaintiff understood, and could use English rather fluently, for one who never went to school, he could not read or write in any language, and it is

not claimed that he understood the part written in Arabic. It is said that the part in English was read to him, and fully explained, before he signed the document. This is denied by plaintiff, however. His claim is that, while it was explained, the statements made to him were as embodied in the following quotations from the record:

"On that day when there these two parties came up, did not know they were coming. At that time did not know Coates. I think it was around five o'clock. After shaking hands and sitting down, Thorne did the talking. He said he is going to give me some money for wages and expenses. He said he will do what is right later on. I said, 'What is that for?' and he said he couldn't come here all the time, and he said he will give me that much for when I am laid up for wages and expenses, and he will do what is right later on. There wasn't money there when I came in; he counted out $600 on the table, fives, tens and twenties in gold; and in counting it out he said there was $500 in gold; he threw it on the table and counted it, and put it in a sack. He got up and wanted to go home, and he shook hands with me, and he said, 'Don't worry about it; we will do what is right with you later on.' As to how they happened to come up there, or who had sent them up there, they never said a word. Mr. Thorne had a paper there; he did not read that paper to me, at any time while he was there; nobody else read it to me. He said, 'This is $600 for your wages and expenses.' I asked, 'What is that for?' and he said, 'That's what that paper is for.' I said, 'What's in it?' and he said it was $600 for wages and due me while I lay around. I could not read the paper that he had there that day. He did not at any time while I was there read part of the paper and explain,—he never read a word of it. Thorne asked me to sign it. When he told me that this paper was simply to show that I had received this $600 for wages and spending money while I was laid

up, I believed that .to be true.  He did not at any time while
he was up there say that this money was given to me in set-
tlement, or full settlement of my claim; he never mentioned
that; the word 'settlement' was not used by Thorne or any-
body else in that room.  At. the time he asked me to sign
this paper, and I signed it, I did not have any idea that
this paper purported to be a settlement and release of
my claim; if I had thought that this paper was a full set-
tlement and release, I would not have signed it.  If Mr.
Thorne had said to me that this paper was a settlement,
or a full settlement, of my claim, would not have signed it,—
I should say not.  These marks on this paper, that are called
Arabic writing, when Thorne had it in the room, I never
noticed; there was marking on there, but I don't know
what they are; do not know what the words 'Accord and
satisfaction' mean; Mr. Thorne nor anybody else explained
to me what the words 'accord and satisfaction' meant that
afternoon up in that room.  Remember this nurse; I see
her go by; she was called into that room.  When she came
into the room, there was nothing said about her reading
this paper, or having it read.  She asked that the paper be
read; she was told that it wasn't necessary, they are in too
big a hurry, and they got to go—Thorne said that.  Signed
my name to this paper before this nurse came in.  I was in
this room before the nurse came in—I don't think it was
over ten or fifteen minutes—just long enough to sign her
name.  Did not hear anything about Mr. Thorne explaining
this paper to her while she was in that room.  Coates was
outside already when the nurse came in.  He was gone.  He
was gone walking through the hall, going already, going
out and leaving the hospital.  Thorne left the room next.
The nurse was the next to leave the place.  I gave her the
sack of money to keep for me until tomorrow.  Before
they came up there that afternoon with this sack of money,
I did not know anything about their intending to bring up

this money; before that did not at any time have any talk with Thorne whereby he and I had agreed on the terms of the settlement of my claim; had bandage on my eyes that day when I came into this room."

On cross-examination he testified: "When I came down from the hospital, he told me himself it was in that pool hall, and that is how I found out; when I signed my name on there, I didn't know what was in it; I don't know it was Syrian on there; I didn't see them at that time; I don't pay attention what was on there; I don't know anything about whether Mr. Thorne wrote that on there; I don't know, maybe he write Syrian and maybe not; I did not ask him. I asked him what that money was for; I asked him what was in that paper; he said my wages and expenses. He told me that in this paper it stated $604; I asked him what was in the paper, and he said, '$604, your wages and expenses until you get well, and that is that that was in it.' When he told me that Coates was there, did not ask Mr. Coates to read it to me. I saw the nurse there when they were ready to go, after I signed the paper. After I signed she came in. When Miss Harris was there, I did not tell her anything; didn't ask her to read it to me; I asked Thorne what was in it, and he said, 'That's what was in it.' I don't know what language it was in. I thought it was all right. Nothing was never read in that room. Besides the Arabians and Syrians I knew in Dubuque, I had lots of friends; knew all those people who wrote letters for me. I believed it was all right what he told me. I didn't know he was doing that kind of work, otherwise I wouldn't have signed it. Talked with Mr. Thorne about settlement of this case before I signed this paper only once, him and McDonald's agent. Mr. Thorne come to see me at the hospital. It wasn't about this case; he was supposed to go up there and see how I get along and one thing and another. He never said anything about the

case only once. The first thing Thorne did when he came up that day, he put out his hand and ask me how I feel, and said, 'How are you getting along?' I said 'I have pretty much pain yet,' and he said, 'We haven't time to come here every day; I know you haven't much money on hand.' I said, 'What's that for,' and he said, 'We give you that for expenses while you lay around, and we will take care of you later.' Did not know how much wages I had coming at that time; did not figure it up with him. He gave me $604. Was getting per week down at McDonald's $14.30. I don't know how many weeks it would take to earn $604. Had not earned $604 up to that time that wasn't paid. Don't know what there was due me, or would be due me during the time I would be in the hospital,—about $104 for wages. He didn't tell me that; he did not say anything about paying the hospital bill, nor Dr. Mehlhop's bill, nor any expense of the doctors' who had treated me up to that time. I paid some to Dr. Langworthy; didn't pay any to Dr. Mehlhop, or Dr. Hancock, nor Finley Hospital; didn't pay anything for this wagon that they take people to the hospital in; sent bills to boarding house for $33.75; don't know that the Finley Hospital bill is fully paid, only what I heard. Mr. Coates was in the room as I signed. Before that, I signed that it was all right; afterward, they very seldom came in, once a week, or hardly sometimes once in two weeks. I saw Whitneys once after I signed, and I saw Andrew once and that settles it. I didn't see no fruit though after that."

Plaintiff also testified in substance as follows:

"After I left the hospital, and went down to Thorne's office with Coates on that day, they claimed this paper was a full settlement. It done set me crazy when they said that. After that, learned something about Thorne having some foreign language on a paper up in a pool hall. I went up there, and I heard he had something written in the pool

hall up there, and I took Sam Karam with me and went to Thorne's office. I said, 'How is it you got something on that paper,' and I said, 'You know I can't read and write,' and he said, 'I forgot all about it.' He said that to Sam Karam,—I was there when he said it. When I came out of the hospital and went to Coates' office, and he took me down to Thorne's office, and I then learned they claimed this paper was a settlement, Thorne hardly couldn't give me no answer; sometimes he said it was a settlement, and sometimes he said, 'It wasn't anything you signed.'

Also, on cross-examination, he testified:

" 'You remember we made a settlement up there,' and I got mad, and Mr. Coates went out. Then I went down to McDonald's; I saw Whitney; I said, 'What's the matter with you; you play a trick on me sending an agent up there,' and he said they had nothing to do with that at all; that they never sent an agent up there. He said nothing about settle; he said they had no agent and never sent one up there. Then I met Thorne on the street, and he wants to give me $600 more and a life job, and I wouldn't take him any more; I said I wanted $10,000. That is the time I came down from the second operation they had on me, about a week after,—don't know what month it was. When Thorne and Coates were together up there, nothing was said about any part of this money being for my eye."

Plaintiff offered to show that, about the middle of November, and just after he had an operation on his eye, Thorne appeared at the hospital, with a man whom he introduced as defendant's claim agent, and that a settlement was then talked about; but on defendant's objections, he was not permitted to show what was said at that time. He also offered to show that Thorne visited him on several occasions, and at one time offered him $1,000, in addition to his wages and expenses, and that plaintiff refused to accept

the same. This proposition is said to have been made be-
fore the release in question was signed. The trial court
sustained objections to the questions propounded to elicit
this testimony. While it is claimed in argument that plain-
tiff was suffering great pain at the time the release was
signed, we are of opinion that there was no such showing
as would justify a jury in setting aside the release on this
ground alone. True, plaintiff suffered very severe injuries,
which were quite painful. The left eye was practically
destroyed by the molten brass, and what was left of it was
immediately removed by the attending physician. The right
eye also suffered sympathetically, and, at the time the re-
lease was signed, plaintiff's left eye was bandaged; and,
although he could see more or less out of his right eye, it
had not fully adjusted itself. Several operations were had
upon the lids and socket of the left eye for the purpose of
fitting it for a glass eye, but this had to be abandoned.
Doubtless plaintiff suffered much from his injury, not only
because of the physical pain, but also from the thought
that he would remain disfigured for life, and might also
lose the other eye. These matters were proper to be con-
sidered upon the main issue with reference to the settle-
ment,—that is, as to whether it was the free and voluntary
act of plaintiff, and as to whether or not he was misled into
signing something he did not fully comprehend, or under-
stand. It is not claimed that plaintiff could read either
English or any other language. Reliance is placed upon
the proposition that the instrument was read to him and
fully explained, so that he knew what he was signing. We
have quoted enough of the testimony in plaintiff's favor,
and put most strongly in his behalf, to indicate that this,
too, was a question which should have been submitted to
a jury, under proper instructions. This whole matter is

reviewed in the recent case of *Reddington v.*

**4. RELEASE: avoidance: return of consideration received: when not necessary.** *Blue & Raftery*, 168 Iowa 34. See also *Jaques v. Sioux City Traction Co.*, 124 Iowa 257; *Douda v. Chicago, R. I. & P. R. Co.*, 141 Iowa 82, 87; *Providence Jewelry Co. v.*

*Fessler*, 145 Iowa 74; *Blossi v. Chicago & N. W. R. Co.*, 144 Iowa 697; *Kilmartin v. Chicago, B. & Q. R. Co.*, 137 Iowa 64. These cases also settle the point that plaintiff was not bound to return to return the money paid him at the time the paper was signed.

**5. RELEASE: avoidance: fraud: evidence.** III. We think plaintiff should have been permitted to show all conversation between him and Thorne with reference to a proposed settlement, both before and after the release was signed. Fraud, mistake and misrepresentation having been pleaded, these opened a wide door, and all the negotiations between Thorne and the plaintiff should have been given to the jury.

IV. Again, plaintiff was unduly limited in his cross-examination of the witness Coates. Matters inquired into in chief were closed against plaintiff's cross-examination.

**6. PLEADING: form and allegation: pleading evidence: motion to strike.** V. In his reply to the answer pleading the settlement, plaintiff pleaded as follows: "For further reply to Division Four (4), this plaintiff avers that, on or about the 18th or 19th day of December, 1912, one C. M. Thorne, in company with F. W. Coates, came to the hospital where this plaintiff was then confined, due to his said injury. That before said time, and after the injury to this plaintiff, said C. M. Thorne, claiming to represent the defendant and the Liability Company, offered plaintiff $1,000 for the injury to his eye, in addition to all loss for wages, expense, medical attendance, etc., which this plaintiff refused."

To say the most, this was but a pleading of evidence, and the same was properly stricken from the reply, on defendant's motion. This, of course, does not mean that testimony such as indicated by this pleading is inadmissible. That question has already been considered in this opinion, and, in view of the real issues tendered, such testimony is held admissible. We are not to be understood as deciding the real merits of the case. That is not our province. The question we have to decide is this: Was there enough testimony in plaintiff's favor upon the several issues joined to take the case to a jury, for its decision as to the very right of the matter?

Nothing is said in argument regarding the present statutes with reference to contributory negligence and assumption of risk. That there may be no misapprehension regarding these matters, we may say that, under the doctrine announced in *Correll v. Williams,* 173 Iowa 571, there was no assumption of risk in the case, provided the present statute is applicable to plaintiff's case. For the errors pointed out, the judgment must be, and it is,—*Reversed.*

Gaynor, C. J., Weaver and Preston, JJ., concur.